EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación Puertorriqueña de Importadores de Cerveza, Inc., y Otros<br><br>        Peticionarios<br><br>             v.<br><br>Estado Libre Asociado de Puerto Rico; José A. Flores Galarza, Etc.<br><br>        Recurridos | Certiorari<br><br>2007 TSPR 92<br><br>171 DPR \_\_\_\_ |

Número del Caso: CC-2003-831

Fecha: 16 de mayo de 2007

Tribunal de Apelaciones:

                Región Judicial de San Juan Panel I

Juez Ponente:

                Hon. Carlos Rivera Martínez

Abogados de la Parte Recurrida:

                Lcdo. Jorge E. Pérez Díaz
                Lcdo. Gerardo J. Rivera-Fourquet
                Lcda. Heidi L. Rodríguez
                Lcdo. Gerardo De Jesús Annoni

Abogados de la Parte Peticionaria:

                Lcda. Ana Matilde Nin Torregrosa
                Lcdo. Juan A. Marqués Díaz
                Lcda. Verónica Ferraiuoli
                Lcdo. Federico Calaf Legrand
                Lcdo. Ramón Walker Merino
                Lcdo. Horacio Subirá

Materia: Sentencia Declaratoria y Petición de Interdicto Preliminar y
        Permanente

Este documento constituye un documento oficial del Tribunal Supremo
que está sujeto a los cambios y correcciones del proceso de
compilación y publicación oficial de las decisiones del Tribunal. Su
distribución electrónica se hace como un servicio público a la
comunidad.

TRIBUNAL SUPREMO DE PUERTO RICO

Asociación Puertorriqueña de
Importadores de Cerveza, Inc.;
Heineken Brouwerijen B.V.;
V. Suárez & Co., Inc.; Méndez
& Co., Inc.; B. Fernández &
Hnos., Inc. y Ballester
Hermanos, Inc.

       vs.                CC-2003-831      CERTIORARI

Estado Libre Asociado de PR;
José A. Flores Galarza, en
Capacidad Oficial como
Secretario de Hacienda;
Cervecería India, Inc. y CC1
Beer Distributors, Inc.

SENTENCIA

San Juan, Puerto Rico, a 16 de mayo de 2007

La Ley Número 69 de 30 de mayo de 2002 enmendó las Secciones 4002 y 4003 del Código de Rentas Internas de Puerto Rico, 13 L.P.R.A. secs. 9521 y 9574. La enmienda realizada tuvo el propósito de aumentar los impuestos aplicables a los espíritus destilados, los vinos y las cervezas. Dicha Ley 69, sin embargo, concede un alivio al establecer, en su Artículo 2, una exención contributiva escalonada a toda cerveza, extracto de malta y otros productos análogos fermentados, o no fermentados, cuyo contenido alcohólico no exceda de uno y medio por ciento (1½%) por volumen, que sean producidos o fabricados por personas cuya producción total, durante su año contributivo más reciente, no exceda de treinta y un millones (31,000,000) de galones.

Los aquí peticionarios, la Asociación Puertorriqueña de Importadores de Cerveza, Inc. y otros, radicaron una solicitud de sentencia declaratoria ante la Sala Superior de San Juan del Tribunal de Primera Instancia contra el Estado Libre Asociado de Puerto Rico y otros, en solicitud de que se decretara la inconstitucionalidad del antes mencionado Artículo 2 de la citada Ley 69 del 2002. Plantearon que, a su juicio, la referida disposición estatutaria tenía el propósito, y efecto, de favorecer la cerveza producida en nuestra Isla y, naturalmente, el de perjudicar a las cervezas importadas. Adujeron, además, que dicha disposición era violatoria de la cláusula de comercio interestatal de la Constitución de los Estados Unidos y de la Sección 3 de la Ley de Relaciones Federales, 48 U.S.C. sec. 741(a).

La parte demandada solicitó la desestimación de la demanda radicada alegando, en síntesis, que la decisión emitida por este Tribunal en U.S. Brewers Assoc. v. Secretario de Hacienda, 109 D.P.R. 456 (1980), había resuelto la controversia planteada y que no existía violación constitucional alguna. El tribunal de instancia desestimó la demanda radicada, decisión que fue confirmada por el Tribunal de Apelaciones.

Los demandantes peticionarios acudieron, entonces, ante este Tribunal, señalando la alegada comisión de tres errores de parte del Tribunal de Apelaciones, a saber:

… al confirmar la desestimación de la Petición Jurada sin haber dado por ciertos los hechos aseverados en la demanda y tomando por ciertos otros que no surgían de la misma, contrario a la norma para la desestimación bajo la Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa.

… al determinar que el Artículo 2 no viola la Sec. 3 LRF ni la Cláusula de Comercio, aplicando equivocadamente lo resuelto en el caso de *U.S. Brewers Assoc.* v. *Srio. De Hacienda*, 109 D.P.R. 456 (1980).

… al restringir su análisis sobre el propósito del Artículo 2 al texto de la Ley 69, así ignorando la norma de interpretación pautada por este Honorable Tribunal.

Expedimos el recurso. Examinado el expediente del caso y habiendo analizado cuidadosamente todos los planteamientos de las partes, procede dictar Sentencia confirmatoria de la emitida por el Tribunal de Apelaciones, decretando la desestimación de la acción radicada por la parte demandante peticionaria.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señor Rebollo López y señor Fuster Berlingeri emitieron Opiniones de Conformidad. La Juez Asociada señora Fiol Matta inhibida. La Juez Asociada señora Rodríguez Rodríguez no interviene.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

TRIBUNAL SUPREMO DE PUERTO RICO

Asociación Puertorriqueña de
Importadores de Cerveza, Inc.;
Heineken Brouwerijen B.V.;
V. Suárez & Co., Inc.; Méndez
& Co., Inc.; B. Fernández &
Hnos., Inc. y Ballester
Hermanos, Inc.

     vs.                  CC-2003-831
   CERTIORARI

Estado Libre Asociado de PR;
José A. Flores Galarza, en
Capacidad Oficial como
Secretario de Hacienda;
Cervecería India, Inc. y CC1
Beer Distributors, Inc.


OPINIÓN DE CONFORMIDAD EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 16 de mayo de 2007

El 13 de julio de 1978 se aprobó la Ley Núm. 37 mediante la cual se enmendó la Ley Núm. 143 de 30 de junio de 1969, conocida como la Ley de Bebidas de Puerto Rico. Dicha enmienda consistió en aumentar la contribución sobre la cerveza que se vende y consume en nuestra jurisdicción y establecer una exención especial para las compañías productoras de cerveza cuya producción anual no sobrepase los treinta y un millones (31,000,000) de galones.

Poco tiempo después, la U.S Brewers Association, entidad que entonces agrupaba al 95% de los manufactureros de cerveza de los

Estados Unidos, presentó ante el foro local una demanda impugnando la referida exención porque, a su entender, violaba la Sección 3 de la Ley de Relaciones Federales y la cláusula sobre igual protección de las leyes, Sec. 7, Artículo 2, Constitución del Estado Libre Asociado de Puerto Rico. Al resolver la mencionada controversia, este Tribunal determinó que la aludida exención no violaba las disposiciones antes mencionadas porque, entre otras cosas, tenía un propósito legítimo, no discriminatorio, y porque la clasificación allí establecida podía favorecer tanto a empresas locales como extranjeras. U.S. Brewers Assoc. v. Secretario de Hacienda, 109 D.P.R. 456 (1980).

Luego de ser enmendada en dos ocasiones posteriores, para los únicos efectos de aumentar el monto de la contribución[1], la Asamblea Legislativa aprobó la Ley Núm. 69 del 30 de mayo de 2002, mediante la cual enmendó las Secciones 4002 y 4003 del Código de Rentas Internas de Puerto Rico, 13 L.P.R.A. §§ 9521 y 9574. Dichas enmiendas, entre otras cosas, tuvieron el propósito de aumentar los impuestos aplicables a los espíritus destilados, los vinos y las cervezas. Como alivio para el mencionado aumento, la Legislatura concedió, en el Artículo 2 de la mencionada Ley, una exención contributiva escalonada a toda cerveza, extracto de malta y otros productos análogos fermentados, o no fermentados, cuyo contenido alcohólico no excediera de

---

[1] Véanse, Leyes Núm. 12 del 10 de junio de 1981 y Núm. 22 del 14 de julio de 1989.

uno y medio por ciento (1½%) por volumen, que sean

producidas o fabricadas por personas cuya producción total

durante su año contributivo más reciente no haya excedido de

treinta y un millones (31,000,000) galones medida.[2]

---

[2] El Artículo 2 antes mencionado dispone lo siguiente:

"(a) En lugar del impuesto establecido en la sec. 9521(c)(2) y (3) de este título sobre toda la cerveza, extracto de malta y otros productos análogos fermentados o no fermentados cuyo contenido alcohólico exceda de uno y medio por ciento (11/2%) por volumen a que se refiere la sec. 9521(c)(2) y (3) de este título, que sean producidos o fabricados por personas cuya producción total, si alguna, de dichos productos durante su más reciente año contributivo no haya excedido de treinta y un millones (31,000,000) de galones medida, se cobrará un impuesto de la siguiente forma:

(1) Dos dólares con quince centavos ($2.15) por cada galón medida producido, hasta nueve millones (9,000,000) de galones medida.
(2) Dos dólares con treinta y seis centavos ($2.36) por cada galón medida producido en cantidad mayor a nueve millones (9,000,000) pero menor a diez millones (10,000,000).
(3) Dos dólares con cincuenta y siete centavos ($2.57) por cada galón medida producido en cantidad mayor a diez millones (10,000,000) pero menor a once millones (11,000,000).
(4) Dos dólares con setenta y ocho centavos ($2.78)por cada galón medida producido en cantidad mayor a once millones (11,000,000) pero menor a doce millones (12,000,000).
(5) Dos dólares con noventa y nueve centavos ($2.99) por cada galón medida producido en cantidad mayor a doce millones (12,000,000) pero menor a treinta y un millones (31,000,000).

(b) Sujeto a las disposiciones de las secs. 9575 a 9579 de este título, los beneficios de esta sección procederán para una persona en cualquier año contributivo siguiente a aquel año en que su producción total de los productos descritos en este inciso, si alguno, no haya excedido de treinta y un millones (31,000,000) de galones medida.

Así las cosas, el 13 de junio de 2002, la Asociación Puertorriqueña de Importadores de Cerveza, Inc. (APIC); Heineken Brouwerijen B.V.; V. Suárez & Co., Inc.; Méndez & Co., Inc.; B. Fernández & Hnos., Inc. y Ballester Hermanos, Inc. --en adelante, los peticionarios-- presentaron una solicitud de sentencia declaratoria ante el Tribunal de Primera Instancia, Sala Superior de San Juan, contra el Estado Libre Asociado de Puerto Rico, el Secretario de Hacienda, Cervecería India, Inc. y CC1 Beer Distributors, Inc., en adelante los recurridos. Solicitaron se decretara la inconstitucionalidad del Artículo 2 de la Ley. Núm. 69 del 30 de mayo de 2002 porque, a su entender, tenía el efecto y propósito de favorecer a la cerveza producida en Puerto Rico y perjudicar a las cervezas importadas. Solicitaron, además, que se decretara, mediante la referida sentencia declaratoria, que el referido Artículo 2 violaba tanto la cláusula de comercio interestatal de la Constitución de los Estados Unidos[3] como la Sección 3 de la Ley de Relaciones Federales.[4] Finalmente solicitaron que se dictara un interdicto preliminar en el que se le impidiera al Gobierno de Puerto Rico poner en vigor la referida disposición legal en lo que se dilucidaba el pleito en sus méritos.

---

[3] Artículo 1, Sec. 8, Const. Estados Unidos de América.

[4] 48 U.S.C. § 741(a) y 1 L.P.R.A. Ley de Relaciones Federales § 3.

Posteriormente, todos los demandados solicitaron la desestimación de la acción radicada, oponiéndose a la solicitud de interdicto preliminar.[5] En esencia alegaron que, aun asumiendo como ciertos los hechos bien alegados en la acción radicada, la parte demandante no había expuesto una reclamación que justificara la concesión de los remedios solicitados. Plantearon, en apoyo a su solicitud, que lo resuelto en U.S. Brewers Assoc. v. Secretario de Hacienda, ante, controlaba la controversia surgida en el presente caso; que no existía violación alguna a la cláusula de comercio interestatal, ya que la exención era totalmente neutral y no discriminaba contra el comercio interestatal o internacional ni de su faz ni por su propósito o efecto; y que no existía violación alguna a la Ley de Relaciones Federales, toda vez que éste Tribunal ya había determinado la legalidad de dicha disposición.

Luego de evaluar la posición de ambas partes en sus respectivos escritos y los argumentos expuestos en una vista argumentativa, el foro primario emitió una sentencia en la que desestimó la acción presentada por los demandantes. El referido foro sostuvo que: 1) lo resuelto por este Tribunal en U.S. Brewers Assoc. v. Secretario de Hacienda, ante, disponía de la reclamación de los demandantes relativa a que el Artículo 2 de la Ley Núm. 69, ante, contravenía la

[5] Los demandados comparecieron en dos mociones diferentes. Por un lado, comparecieron Cervecería India y su distribuidora y, por el otro lado, comparecieron el Estado Libre Asociado y el Secretario de Hacienda.

Sección 3 de la Ley de Relaciones Federales, ante; 2) que la alegación en torno a que el efecto de la exención impugnada atentaba contra la cláusula de comercio interestatal e internacional era inmeritoria debido a que en U.S. Brewers, ante, este Tribunal había resuelto, aunque no se planteó específicamente, que dicha exención tenía el propósito legítimo de distribuir la carga contributiva entre las cervecerías de acuerdo a su potencial para producir ganancias[6]; y 3) que el análisis exigido ante alegaciones de supuestas violaciones a la cláusula de comercio interestatal e internacional, por el supuesto efecto discriminatorio de alguna ley, revelaba que el artículo de ley impugnado en el presente caso no era discriminatorio.

Inconformes con la determinación del foro primario, los demandantes acudieron --mediante recurso de *certiorari*-- ante el Tribunal de Apelaciones. Adujeron, en síntesis, que el foro de instancia había errado al desestimar la acción radicada sin dar como ciertos los hechos alegados en la demanda y al no recibir prueba ofrecida sobre el propósito y efecto discriminatorio de la exención. Alegaron, además, que el tribunal de instancia había interpretado incorrectamente el caso de U.S. Brewers Assoc. v. Secretario de Hacienda,

---

[6] El foro primario tomó dicha determinación debido a que, entre otras cosas, "las determinaciones de si la Legislatura de Puerto Rico tuvo propósitos discriminatorios contra la cerveza importada y si la Ley aplica solamente a empresas locales y por ello tiene efecto discriminatorio, es la misma independientemente de si el reclamo es por violación a la Sección 3 de la Ley de Relaciones Federales y a la igual protección de las leyes, o por alegada violación a la cláusula de comercio interestatal e internacional."

ante, al resolver que la exención impugnada no violaba la Sección 3 de la Ley de Relaciones Federales ni la antes mencionada cláusula de comercio interestatal e internacional.

El Tribunal de Apelaciones confirmó la decisión del foro primario. En esencia, el tribunal apelativo intermedio sostuvo que actuó correctamente el mencionado foro al desestimar la acción radicada debido a que éste sí dio como ciertos los hechos correctamente alegados en la demanda y que el resto de los "hechos" allí expuestos eran conclusiones de derecho o manifestaciones especulativas. En cuanto a los alegados ofrecimientos de prueba, el foro apelativo intermedio concluyó que el foro primario sí los dio como ciertos pero que, aun así, ello no ameritaba la concesión de un remedio a favor de los demandantes. Finalmente, el referido foro apelativo estimó que, conforme a la doctrina de *stare decisis*, lo resuelto por este Tribunal en U.S. Brewers Assoc. v. Secretario de Hacienda, ante, aplicaba a la presente controversia en cuanto a la alegación referente la Sección 3 de la Ley de Relaciones Federales y que tampoco tenía propósitos proteccionistas que la invalidaran a la luz de la cláusula de comercio interestatal e internacional de la Constitución de los Estados Unidos.

Inconformes, los demandantes acudieron --mediante recurso de *certiorari*-- ante este Tribunal. Alegan que

procede revocar la sentencia emitida por el foro apelativo intermedio debido a que dicho foro incidió:

> … al confirmar la desestimación de la Petición Jurada sin haber dado por ciertos los hechos aseverados en la demanda y tomando por ciertos otros que no surgían de la misma, contrario a la norma para la desestimación bajo la Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa.

> … al determinar que el Artículo 2 no viola la Sec. 3 LRF ni la Cláusula de Comercio, aplicando equivocadamente lo resuelto en el caso de *U.S. Brewers Assoc.* v. *Srio. De Hacienda*, 109 D.P.R. 456 (1980).

> … al restringir su análisis sobre el propósito del Artículo 2 al texto de la Ley 69, así ignorando la norma de interpretación pautada por este Honorable Tribunal.

I

A

De entrada, discutiremos, brevemente, el primer señalamiento de error, relativo a la alegada improcedencia de la desestimación al amparo de las disposiciones de la Regla 10.2 de las de Procedimiento Civil.

Como se sabe, las alegaciones tienen el propósito de notificar a grandes rasgos cuáles son las reclamaciones y defensas de las partes. Álamo Pérez v. Supermercado Grande, 158 D.P.R. 93 (2002); Banco Central Corp. v. Capitol Plaza Inc., 135 D.P.R. 760 (1994). Es por ello que la Regla 6.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 6.1, sólo exige que las alegaciones de la demanda contengan una relación sucinta y sencilla de la reclamación demostrativa de que el peticionario tiene derecho a un remedio y una solicitud del remedio a que crea tener derecho. Véase: José

Cuevas Segarra, Tratado de Derecho Procesal Civil, Publicaciones J.T.S., Tomo I, 2000, pág. 202 -208.

A pesar de ello, la Regla 10.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 10.2, establece, como fundamento por el cual una parte puede solicitar la desestimación de una demanda presentada en su contra, que las alegaciones dejan de exponer una reclamación que justifique la concesión de un remedio. Reiteradamente hemos resuelto que, ante una solicitud de desestimación por el fundamento antes mencionado, los tribunales deben aceptar como ciertas las alegaciones contenidas en la demanda y considerarlas de la manera más favorable a la parte demandante. García Gómez v. E.L.A., res. el 24 de febrero de 2005, 2005 TSPR 14.

Para que un demandado prevalezca, mediante una moción de desestimación bajo el mencionado precepto procesal civil, éste tiene que demostrar que, con toda certeza, el demandante no tiene derecho a remedio alguno bajo cualquier estado de derecho que pueda ser probado en apoyo a su reclamación, aún interpretando la demanda de la manera más liberal posible a su favor. No obstante lo anterior, esta doctrina se aplica solamente a los hechos bien alegados y expresados de manera clara y concluyente, que de su faz no den margen a dudas. Pressure Vessels P.R. v. Empire Gas, P.R., 137 D.P.R. 497, 504-505 (1994). Dicho de otra manera, solamente se darán como ciertos los hechos correctamente alegados sin considerar las conclusiones de derecho o las

alegaciones redactadas de tal forma que su contenido resulte hipotético. Cuevas Segarra, *op cit*., pág. 272.

De un análisis de la petición jurada presentada por los peticionarios en el presente caso se desprende que éstos, básicamente, alegaron que la exención contributiva concedida a los distribuidores de cerveza que produjeran menos de 31,000,000 galones era inconstitucional por violar la cláusula constitucional federal sobre comercio interestatal y la Sección 3 de la Ley de Relaciones Federales. En apoyo de lo anterior hicieron una serie de alegaciones mediante las cuales pretenden establecer el efecto discriminatorio de dicha exención. Algunas de estas alegaciones son las siguientes:

> "Párrafo 18: Esta acción pretende la anulación, por [ser] contraria a la Ley de Relaciones Federales de Puerto Rico y a la Cláusula de Comercio de la Constitución de Estados Unidos, de aquellas secciones que crean una excepción en la tasa impositiva a favor de una empresa manufacturera privada de Puerto Rico, en detrimento del comercio internacional e interestatal y de los intereses propietarios de otras compañías locales, estadounidenses y extranjeras, las que están sufriendo y continuarán sufriendo daños irreparables…
>
> Párrafo 19: En efecto, y como adelante se alega, la legislación en cuestión crea un discrimen de tal naturaleza, que prácticamente elimina el derecho de los consumidores a adquirir la cerveza de su preferencia y propende a un monopolio sancionado por el estado a favor de una única productora y su distribuidor exclusivo.
>
> Párrafo 38: Todas las partes demandantes quedan afectadas por el arbitrio de ley, no aplicándoles la ley especial.
>
> Párrafo 39: Por información o creencia, solo la productora local, Cervecería India, y su distribuidor para la Medalla Light, su principal

producto, se beneficiarán de la exención especial, o sea, ahora están sujetas a pagar solamente el arbitrio de $2.15 que prevalecía para ellos bajo la legislación anterior. Ello es así porque la producción total de la cervecería local no excede de 9 millones de galones ni lo ha excedido por años.

Párrafo 43: Aunque la medida ni su exposición de motivos expresan de su faz un ánimo discriminatorio o proteccionista, inconstitucional y estatutariamente prohibido, en su efecto, sin lugar a dudas lo tiene.

Párrafo 44: A poco que se examine el historial legislativo y las ponencias presentadas ante la Legislatura, y los debates legislativos y otras manifestaciones públicas de los legisladores, se verá claramente que, a pesar de la reticencia en un principio del Ejecutivo y el Legislativo en perpetuar el discrimen creado por la exención especial, ni la medida ni el presupuesto pendiente de aprobación hubieran obtenido los votos necesarios de no darse el trato preferente excesivo que esta medida propone, únicamente para el beneficio de la cervecería local. Véase, Ponencia de la Vice-Presidenta Ejecutiva de la Cervecería India, del 8 de abril de 2002; Ponencia del Alcalde de Mayagüez, en apoyo a las peticiones de trato preferente a la cervecería local, entre otros.

Párrafo 46: El Artículo 2 de la Ley 69 del 30 de mayo de 2002, 13 L.P.R.A. § 4023, en sus efectos y aplicación, crea una restricción prohibida al comercio interestatal, al promover un discrimen, irracional, restrictivo e injusto a favor de un solo productor local, y en perjuicio del libre flujo de comercio.

Párrafo 47: El peso total del aumento, aunque de la faz de la Ley parece aplicar por igual a entidades de Puerto Rico y de Estados Unidos, en efecto recae totalmente sobre los distribuidores puertorriqueños que venden cervezas manufacturadas en Estados Unidos, con el propósito prohibido de dificultar la importación, mercadeo y venta de las cervezas de origen estadounidense.

Párrafo 50: El Artículo 2 de la Ley 69 del 30 de mayo de 2002, 13 L.P.R.A. § 4023, en sus efectos y aplicación, crea una restricción prohibida al comercio internacional, al promover un discrimen

irracional, restrictivo e injusto a favor de un solo productor local, y en perjuicio del libre flujo del comercio.

Párrafo 51: El peso total del aumento, aunque de la faz de la Ley parece aplicar por igual a entidades de Puerto Rico y de fuera de Puerto Rico, en efecto recae totalmente sobre los distribuidores puertorriqueños que venden cervezas manufacturadas fuera de Puerto Rico, con el propósito prohibido de dificultar la importación, mercadeo y venta de las cervezas de origen extranjero.

Párrafo 55: El Artículo 2 de la Ley Núm. 69 del 30 de mayo de 2002, 13 L.P.R.A. § 4023, en su aplicación y efectos, según anteriormente alegados, violan la clara y diáfana disposición del Artículo 3 de la Ley de Relaciones Federales.

Aun cuando las antes transcritas alegaciones no son un modelo de perfección, una mera lectura es suficiente para percatarse que éstas pueden considerarse como alegaciones bien hechas para los efectos de conceder el remedio solicitado. De hecho, tanto el tribunal de instancia como el foro apelativo intermedio entraron a analizar las alegaciones esenciales efectuadas por los peticionarios y, finalmente, determinaron que eran inmeritorias.

En consecuencia, pasamos a evaluar la validez del planteamiento principal de los peticionarios relativo a que el Artículo 2 de la Ley Núm. 69 de 30 de mayo de 2002, discrimina contra el comercio interestatal e internacional y por tanto viola la cláusula de comercio interestatal o la Sección 3 de la Ley de Relaciones Federales.

B

La Constitución del Estado Libre Asociado de Puerto Rico dispone que "el poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido." 1 L.P.R.A. Art. VI, § 2. Dicha autoridad contributiva es fundamental a la vida del Estado y por lo tanto el poder fiscal gubernamental es constitucionalmente de naturaleza amplia y abarcadora. Café Rico, Inc. v. Municipio de Mayagüez, 155 D.P.R. 548 (2001); Continental Insurance Company v. Secretario de Hacienda, 154 D.P.R. 146 (2001); F.D.I.C. v. Mun. de San Juan, 134 D.P.R. 385 (1993); Coca-Cola Bottling v. Srio. de Hacienda, 112 D.P.R. 707 (1982); U.S. Brewers Association v. Srio. de Hacienda, 109 D.P.R. 456 (1980).

No obstante, el amplio poder antes mencionado cede ante limitaciones constitucionales o de otra índole. Una de esas limitaciones la establece la Sección 3 de la Ley de Relaciones Federales, 1 L.P.R.A., que en lo pertinente indica que:

> "… las contribuciones de rentas internas que de acuerdo con la facultad concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico, sobre cualesquiera artículos, efectos, mercaderías o mercancías podrá ser impuesta y cobrada sobre los artículos sujetos a dicha contribución, según determine la referida Asamblea legislativa, tan pronto como los mismos hayan sido fabricados, vendidos, usados o importados en la Isla; Disponiéndose, que no se hará distinción alguna entre los artículos importados de los Estados Unidos o de países

extranjeros y los artículos similares producidos
o manufacturados en Puerto Rico…" (Énfasis
nuestro).

Asimismo, la cláusula de comercio interestatal de la
Constitución de los Estados Unidos establece que:

El Congreso tendrá facultad: Para imponer y
recaudar contribuciones, derechos, impuestos y
arbitrios…

Para reglamentar el comercio con naciones
extranjeras, así como entre los estados y con las
tribus indias… Art. I Sec. 8 Constitución de los
Estados Unidos de América, 1 L.P.R.A.

El propósito de dicho precepto constitucional fue
concederle poder al Congreso para regular tanto el comercio
interestatal como el internacional. Por ello, se ha dicho
que el mismo es la máxima fuente de poder congresional.
Laurence H. Tribe, *I American Constitutional Law*, 3d Ed.,
Nueva York, Foundation Press., 2000, págs. 801-808.

Por otro lado, y a pesar de que la Constitución federal
en ningún lugar limita la interferencia estatal con el
comercio interestatal,[7] el Tribunal Supremo federal desde
1852 ha interpretado que la cláusula de comercio también
contiene una prohibición implícita al poder de los estados
de regular el comercio interestatal e internacional, aun en
ausencia de legislación federal expresa. Véase, <u>Cooley</u> v.
<u>Broad of Wardens</u>, 53 U.S. 299 (1852); Tribe, *op cit*. A este
aspecto de la cláusula de comercio se le llama el "aspecto
durmiente o negativo". <u>United States</u> v. <u>South-Eastern</u>

---

[7] Tribe, *op cit*., pág. 1029.

Underwriters Ass'n., 322 U.S. 533, 552 (1944); Southern

Pacific Co. v. Arizona, 325 U.S. 761 (1965). Este aspecto

negativo, previene que los estados arriesguen el bienestar

de la Nación "by plac[ing] burdens on the flow of commerce

across its borders that commerce wholly within those borders

would not bear." (Citas omitidas.) Am. Trucking Ass'ns v.

Mich. PSC, 545 U.S. 429 (2005).

Respecto a la aplicación de la cláusula de comercio en

nuestra jurisdicción, éste Tribunal ha expresado, tanto

antes como después de la aprobación de nuestra Constitución,

que la referida cláusula no es aplicable al Estado Libre

Asociado. Ballester Hnos. v. Tribunal de Contribuciones, 66

D.P.R. 460 (1946); R.C.A. v. Gobierno de la Capital, 91

D.P.R. 416 (1964); South Puerto Rico Sugar Corporation v.

Comisión de Servicio Público, 93 D.P.R. 12 (1966). Entre los

argumentos que hemos esbozado para llegar a tal

determinación están, entre otros, el estatus de territorio

no incorporado de Puerto Rico antes de la aprobación de la

Constitución y los perfiles distintos que han tenido las

relaciones comerciales entre Puerto Rico y los Estados

Unidos y entre los estados de los Estados Unidos.

No obstante lo anterior, en decisiones más recientes

nos hemos alejado de esa postura y hemos dejado entrever que

la mencionada controversia no está resuelta del todo.[8]

---

[8] Vale la pena destacar que en South P.R. Sugar Corp. v.
Comisión de Servicio Público de Puerto Rico, 93 D.P.R. 12
(1966), indicamos que la tarifa impuesta por la Comisión era
válida aun cuando la cláusula de comercio interestatal fuera

Específicamente, en <u>Marketing and Brokerage Specialists, Inc</u>. v. <u>Secretario de Agricultura</u>, 118 D.P.R. 319 (1987), indicamos que en ese momento era innecesario resolver si la cláusula de comercio interestatal en su "estado durmiente" aplicaba a Puerto Rico. Asimismo, en <u>Gómez Hermanos</u> v. <u>Secretario de Hacienda</u>, 114 D.P.R. 367 (1983), utilizamos, para resolver la validez de un impuesto local, los requisitos que la jurisprudencia federal había acogido para evaluar la procedencia de legislaciones tributarias estatales frente a la cláusula de comercio. Finalmente, en <u>Banco Popular</u> v. <u>Mun. de Mayagüez</u>, 126 D.P.R. 653 (1990), aunque no resolvimos la controversia bajo el análisis creado para el "aspecto durmiente" de la cláusula de comercio, <u>sí descrimibos parte del mismo como si éste fuera de total aplicación en nuestra jurisdicción hasta el punto de indicar que la ley allí impugnada podría ser inconstitucional bajo el aludido análisis</u>.[9]

El presente caso nos brinda la oportunidad de resolver, en forma definitiva, <u>la interrogante relativa a si la cláusula de comercio en su "estado durmiente" es aplicable a Puerto Rico</u>. Así pues, antes de entrar a discutir los méritos de las alegaciones de los peticionarios en el

---

aplicable a Puerto Rico en la misma forma que a los estados federales.

[9] A pesar de ello se sostuvo la vigencia de la ley impugnada amparándonos en una interpretación razonable que subsanaba las posibles fallas que ésta podría tener. Véase, <u>Banco Popular</u> v. <u>Mun. de Mayagüez</u>, ante.

presente caso, procederemos a discutir la mencionada interrogante. Veamos.

i

De un examen exhaustivo de la jurisprudencia --tanto local como federal-- y de los tratadistas de derecho constitucional se desprende que la interrogante antes expresada no ha sido ampliamente discutida provocando así que sea escaso el número de fuentes de derecho que nos ayuden a resolverla. Sin embargo, surge de las fuentes existentes que con el pasar de los años se han esbozado varios argumentos a favor y en contra de la aplicación de la cláusula de comercio a nuestra jurisdicción.

Entre los fundamentos más contundentes en contra de la aplicación están, entre otros, que: 1) a Puerto Rico nunca le ha aplicado la Constitución Federal en toda su extensión, ya que nunca ha sido considerado como un estado; 2) que la relación de Puerto Rico con los Estados Unidos, a partir de 1952, es única, por lo que Puerto Rico no puede catalogarse como estado ni como territorio no-incorporado para los efectos de la aludida cláusula; 3) que ni en nuestra Constitución, ni en la Ley 600, ni en la Ley de Relaciones Federales se estableció que dicha cláusula aplicaría a Puerto Rico, por lo que no formó parte del pacto efectuado entre Estados Unidos y Puerto Rico. Véase, Sancho v. Bacardi Corp., 109 F.2d 57 (1st Cir. 1940) (revocado por otros motivos en Bacardi Corp. v. Domenech, 311 U.S. 150 (1940));

Mora v. Torres, 113 F. Supp. 309 (P.R. Dist. 1953); R.C.A.
v. Gobierno de la Capital, ante.

Por otro lado, los argumentos más persuasivos a favor
de la aplicación de la cláusula de comercio a Puerto Rico
son: 1) que aplica a Puerto Rico a través de la cláusula
territorial; 2) que la intención del Congreso al permitir la
aprobación de la Constitución del ELA era organizar un
gobierno local, por lo que su adopción en ningún momento
altera la aplicabilidad a Puerto Rico de las leyes de los
Estados Unidos y de la jurisdicción federal en Puerto Rico;
3) los amplios poderes del Congreso para regular el comercio
en general incluyendo el de Puerto Rico; 4) la obvia
aplicabilidad a Puerto Rico del principio de uniformidad en
el comercio y mercado común. Véase, Starlight Sugar Inc. v.
Soto, 253 F.3d 137 (1st Cir. 2001); Sea Land v. Municipality
of San Juan, 505 F. Supp 533 (P.R. Dist. 1980); Raúl Serrano
Geyls, Derecho Constitucional de Estados Unidos y Puerto
Rico, Vol. I, Programa de Educación Jurídica Continua
Universidad Interamericana de Puerto Rico, San Juan, Puerto
Rico, 1992, a la página 341.[10]

---

[10] Con el pasar de los años la controversia en cuanto a este
tema se ha ceñido a la posible aplicación del aspecto
durmiente de la cláusula de comercio y se ha dejado a un
lado la controversia relativa a la aplicación de la cláusula
de comercio en su aspecto relativo al poder del Congreso de
regular el comercio interestatal. En cuanto a ello, nos
parecen sumamente pertinentes las siguientes expresiones del
Primer Circuito de Apelaciones en Trailer Marine Transport
Corp. v. Rivera Vázquez, 977 F.2d 1 (1st Cir. 1992):

   "Both the Supreme Court and this court have long
   held or assumed that Congress has power under the

La mayoría de los planteamientos antes mencionados provienen de varias decisiones del Tribunal de Distrito Federal de Puerto Rico y del Primer Circuito de Apelaciones. En un principio, ambos foros habían determinado que la cláusula de comercio no aplicaba a Puerto Rico. Mora v. Torres, ante, Buscaglia v. Ballester, 162 F.2d 805 (1st Cir. 1947) y Lugo v. Suazo, 59 F.2d 386 (1st Cir. 1932). Luego, los referidos foros variaron su criterio y resolvieron que era de completa aplicación al Estado Libre Asociado.

El primero de los casos en los que se resolvió a favor de la aplicación de la mencionada cláusula lo fue Sea Land Services, Inc. v. San Juan, 505 F. Supp. 533 (1980). En aquella ocasión el Tribunal de Distrito Federal de Puerto Rico concluyó que el poder otorgado al Congreso a través de la cláusula territorial[11] obligaba a resolver que la cláusula de comercio era aplicable a Puerto Rico tanto en su aspecto positivo como en su aspecto durmiente. Añadió el aludido foro, que las razones que llevaron a los constituyentes a aprobar la cláusula de comercio son igualmente aplicables a

---

Commerce Clause to regulate commerce with Puerto Rico. See Secretary of Agric. v. Central Roig Refining Co., 338 U.S. 604, 616 (1950)(Sugar Act of 1948 applied to Puerto Rico through the Commerce Clause); Puerto Rico Tel. Co. v. F.C.C., 553 F.2d 694, 701 (1st Cir. 1977)(Federal Communications Commission regulations applied via the Commerce Clause to government-owned telephone company in Puerto Rico). Thus, in one aspect, the question "whether the Commerce Clause applies to Puerto Rico" has been settled in the affirmative for many years…"

[11] Artículo IV, Sec. 3 de la Constitución federal.

las relaciones comerciales entre Puerto Rico y los estados o países extranjeros y que resolver que la mencionada cláusula no aplica a Puerto Rico provocaría rivalidades con los estados y evitaría la uniformidad regulatoria en los casos en los que el Congreso lo entendiera pertinente.

A pesar de la determinación anterior, no fue hasta el año 1992, que el Primer Circuito de Apelaciones tuvo la oportunidad de variar sus pronunciamientos hechos en Buscaglia v. Ballester, ante, y Lugo v. Suazo, ante, entre otros, referentes a la no aplicabilidad de la cláusula de comercio a Puerto Rico. Dicha oportunidad surgió en el caso de Trailer Marine Transport Corp. v. Rivera Vázquez, 977 F.2d 1 (1st Cir. 1992), en el cual entre otras cosas el referido foro indicó que:

> "Puerto Rico today certainly has sufficient actual autonomy to justify treating it as a public entity distinct from Congress and subject to the dormant Commerce Clause doctrine. In the Supreme Court's words, 'the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union…' Examinig Board v. Flores de Otero, 426 U.S. 572, 594, 96 S.Ct. 2264, 49 L.Ed. 2d 65 (1976)". (Énfasis nuestro).

El mencionado foro expresó, además:

> "The central rationale of this dormant Commerce Clause doctrine, as the Supreme Court has explained, is the dominant purpose of the Commerce Clause to foster economic integration and prevent local interference with the flow of the nation's commerce. This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puerto Rico as to any state in the Union. In a different context, the Supreme Court has flatly rejected the notion that Puerto Rico may erect an

'intermediate boundary' separating it from the rest of the country. There is no reason to believe that Congress intended to authorize Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise." (Citas omitidas)(Énfasis nuestro).

Para llegar a dicho resultado, el Primer Circuito también se apoyó en pronunciamientos jurisprudenciales hechos por otros Circuitos. Entre ellos el hecho por el Noveno Circuito en Anderson v. Mullaney, 191 F.2d 123, 127 (1951), en el cual se determinó que la doctrina de la cláusula de comercio durmiente era aplicable al entonces territorio de Alaska y el hecho por el Tercer Circuito en JDS Realty Corp. v. Goverment of Virgin Islands, 824 F.2d 256, 259-60 (1987), que hizo lo propio para el actual territorio de las Islas Vírgenes.

En cuanto a dichas decisiones --las relativas a Alaska y a las Islas Vírgenes-- debemos resaltar, más allá de las diferencias entre el tipo de relación que tienen con los Estados Unidos en comparación con Puerto Rico, el lenguaje contenido en Anderson, a los efectos de que:

"But we cannot conceive that in granting legislative power to the Territorial Legislature it was intended that the power should exceed that possessed by the legislature of a State in dealing with commerce. The words 'all rightful subjects of legislation' describing the extent to which the legislative power of the Territory should extend, 48 U.S.C.A. 77, do not include the imposition upon commerce such as that here involved of burdens which a State might not create under like circumstances. 'All rightful subjects of legislation' must be held to refer to matters local to Alaska." Anderson v. Mullaney, ante a la pág. 128.

En decisiones posteriores, el Primer Circuito de Apelaciones ha reiterado, sin mayor explicación, la aplicabilidad de la cláusula de comercio a Puerto Rico. A tales efectos, véase, United Egg Producers, et al. v. Department of Agriculture, 77 F.3d 567 (1st Cir. 1996); Starlight Sugar Inc. v. Soto, ante. Finalmente, vale la pena destacar que tan reciente como en abril de 2005, el referido foro federal resolvió el caso de Walgreens Co., v. Rullán, 405 F.3d 50 (1st Cir. 2005), en el cual reiteró lo antes mencionado al determinar que una ley local que exigía certificados de necesidad y conveniencia a toda persona que interesara adquirir o construir un establecimiento para el cuidado de la salud en la Isla --entre ellos las farmacias-- violaba el aspecto durmiente de la cláusula de comercio de la Constitución federal y por ende era inválida. Dicha decisión fue recurrida, mediante petición de *Certiorari,* ante el Tribunal Supremo federal el 4 de noviembre de 2005. Posteriormente, el 9 de enero de 2006 el Supremo federal denegó la expedición del recurso solicitado. Véase, Pérez Perdomo v. Walgreen Co., 126 S.Ct. 1059, 163 L.Ed. 2d 928 (2006).

Ciertamente, todos los argumentos antes mencionados son altamente persuasivos e incluyen aspectos políticos que deberían resolverse en un foro diferente al judicial. No obstante, somos del criterio que, dadas las circunstancias particulares de nuestra relación con los Estados Unidos, los argumentos a favor de la aplicación a Puerto Rico de la

cláusula de comercio, en su estado durmiente, son más persuasivos que los argumentos en contra.

Primeramente, son hechos que no pueden ser controvertidos que la relación de Puerto Rico con los Estados Unidos es una *sui generis*[12] --que no puede ser catalogada como de territorio incorporado o de territorio no-incorporado-- y que, sea cual sea, dicha relación, el Congreso tiene el poder --a través de la cláusula territorial-- de regular tanto el comercio interestatal como el internacional en Puerto Rico. A raíz de lo anterior, no resultaría correcto atender la controversia relativa a la aplicabilidad del aspecto durmiente de la cláusula de comercio a nuestra jurisdicción bajo la simple aseveración de que la cláusula de comercio no aplica por su propio vigor a los territorios no incorporados.

Así pues, a pesar de existir una relación especial y única entre los Estados Unidos y Puerto Rico, no debe quedar duda que en términos de poderes conferidos para auto-gobernarse el Estado Libre Asociado y los Estados que componen la Unión Americana son extremadamente semejantes. Véase, Examining Bd. Of Eng'rs v. Flores de Otero, ante, a la pág. 595 y Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 671 (1974). Ciertamente, Puerto Rico no es un país ni un territorio independiente para poder tener la libertad de aprobar leyes que atenten contra la estabilidad

---

[12] Califano v. Torres, 435 U.S. 1 (1978); Examinig Board v. Flores de Otero, 426 U.S. 572 (1976).

del comercio interestatal. Véase, Trailer Marine Transport Corp. v. Rivera Vázquez, ante.

Además de lo antes expresado, consideramos que existen otros argumentos que sustentan con igual contundencia la aplicación del aspecto durmiente de la cláusula de comercio en nuestra jurisdicción. A tales efectos, enfatizamos las expresiones del Primer Circuito de Apelaciones en Trailer Marine Transport Corp. v. Rivera Vázquez, ante, relativas a que la completa integración económica --propósito fundamental de la cláusula de comercio-- es igual de esencial para Puerto Rico como para cualquier Estado de la Nación Americana. Dicho de otra manera, no existe fundamento jurídico válido para sustentar que Puerto Rico --en ausencia de legislación federal-- pueda discriminar contra productos de otros Estados, o extranjeros, beneficiando así a los suyos.

Ciertamente, no debe quedar duda en la mente de persona alguna que --por lo menos en materia comercial-- los Estados Unidos ostentan un amplio poder para evitar lo que el Tribunal Supremo federal ha denominado como "...the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." Granholm v. Heald, 544 U.S. 460, 472 (2005), citando a Hughes v. Oklahoma, 441 U.S. 322, 325-326 (1979).

Finalmente, en ausencia de disposición expresa que excluya a Puerto Rico de la aplicación del aspecto durmiente

de la cláusula de comercio[13], <u>no</u> existe razón para creer que el Congreso autorizó a Puerto Rico a discriminar contra el comercio interestatal e internacional. De igual forma, sería arriesgado sostener lo contrario existiendo en la Ley de Relaciones Federales una disposición que impide que la Legislatura del Estado Libre Asociado establezca "… <u>distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico…</u>" Sección 3 de la Ley de Relaciones Federales, ante.

En virtud de todo lo antes expuesto, <u>entendemos que la doctrina relativa al estado durmiente de la cláusula de comercio de la Constitución de los Estados Unidos aplica al Estado Libre asociado de Puerto Rico según la ha desglosado el Tribunal Supremo federal</u>.


C

Ahora bien, expresado lo anterior procede que nos preguntemos cuál es el análisis requerido ante una alegada violación a la mencionada doctrina.

---

[13] La única referencia a la exclusión de Puerto Rico sobre alguna legislación relativa al comercio interestatal está en la Sección 38 de la Ley de Relaciones Federales que dispone que la Ley de Comercio Interestatal no será aplicable a Puerto Rico. No obstante, dicho artículo no puede prohibir más de lo que expresamente dispone, por lo que no se le puede conceder el alcance de impedir la aplicación en nuestra jurisdicción de una disposición constitucional como lo es la cláusula de comercio interestatal. Para expresiones similares, véase <u>Sea Land</u> v. <u>Municipality of San Juan</u>, ante, citando a Helfeld, <u>How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?</u> 39 Rev. Jur. U.P.R. 169 (1969).

Como ya mencionamos anteriormente, el aspecto durmiente o negativo de la cláusula de comercio impide que --aun ante la ausencia de legislación federal vinculante-- un estado apruebe leyes que afecten el comercio interestatal o internacional perjudicando a productos extranjeros o beneficiando a productos locales. En otras palabras y según ha expresado el Tribunal Supremo federal, "[t]he negative or dormant implication of the Commerce Clause prohibits state […] regulation […] that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace'" General Motors Corp., v. Roger W. Tracy, 519 U.S. 278 (1997). (Citas omitidas.)

Como señalan los conocidos tratadistas Rotunda y Nowak, el aspecto durmiente de la cláusula de comercio busca prevenir que los Estados impongan medidas económicamente proteccionistas. Asimismo, indican que es irrelevante si la ventaja es para los comerciantes locales o para los consumidores locales y que ambas situaciones violan el aspecto negativo de la cláusula de comercio. Ronald D. Rotunda & John E. Novak, Treatise on Constitutional Law, West Group 3ra. Ed., Vol. 2 Sec. 11.1 pág. 133 (1999).

El enfoque actual del Tribunal Supremo federal, según el reconocido tratadista Laurence H. Tribe, va dirigido a otorgar mayor énfasis en la pregunta relativa a si el estatuto en controversia discrimina con el comercio interestatal o internacional. Laurence H. Tribe, op cit.

pág. 1059. De este modo, una ley estatal que discrimine contra el comercio interestatal, <u>ya sea de su faz o por su efecto</u>, será invalidada a menos que el estado demuestre que el estatuto persigue un propósito local legítimo y que dicho propósito no puede ser cumplido con medidas no discriminatorias. *Ibid.*

Ahora bien, una ley que no sea discriminatoria ni de su faz ni por su efecto pero que afecte indirectamente al comercio interestatal podrá ser inválida si el peso impuesto al comercio es claramente excesivo en relación con los beneficios putativos locales. <u>Oregon Waste Sys.</u> v. <u>Dept. of Envtl. Quality</u>, 511 U.S. 93, 99 (1994)[14].

En lo que respecta al aspecto específico sobre legislaciones contributivas estatales, el Tribunal Supremo federal ha establecido una <u>regla cardinal</u>, de forma consistente con la cláusula de comercio, que dispone que ningún estado podrá imponer un impuesto que discrimine contra el comercio interestatal proveyendo una ventaja comercial directa a los comercios locales. <u>Bacchus Imports</u> v. <u>Diaz</u>, 468 U.S. 263, 268 (1984), citando a <u>Boston Stock Exchange</u> v. <u>State Tax Comm'n</u>, 429 U.S. 318, 329 (1977) y <u>Northwestern States Portland Cement Co.</u> v. <u>Minnesota</u>, 358 U.S. 450, 458 (1959).

Con el pasar de los años, la doctrina relativa al análisis de las referidas leyes estatales ha quedado

---

[14] "[…] the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

plasmada de la siguiente manera: un impuesto estatal —ante un ataque basado en la cláusula de comercio— será considerado como válido si: 1) existe un nexo sustancial entre la actividad sujeta a la contribución y el estado que la impone; 2) la contribución está distribuida o proporcionada equitativamente; 3) la contribución en cuestión no discrimina contra el comercio interestatal[15]; 4) la contribución está relacionada apropiadamente con los servicios provistos por el estado. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977); véase, además, Iberia v. Secretario de Hacienda, 135 D.P.R. 57 (1993).[16]

En cuanto a dichos criterios, se ha sostenido que el tercer requisito es el dominante y que tanto el primero como el cuarto van dirigidos a demostrar que el estado tiene suficiente relación con la actividad que pretende tributar. Finalmente el segundo va dirigido a asegurarse que los impuestos no obliguen al comercio interestatal a pagar más de lo que le corresponde. Tribe, *op cit.*, págs. 1106-07.

---

[15] Este tercer elemento, se ha analizado de acuerdo al enfoque tradicional que se utiliza cuando una ley es atacada por alegadamente violar el aspecto durmiente de la cláusula de comercio interestatal. Tribe, *op cit.*, pág. 1106. Es decir, que una ley estatal que discrimina contra el comercio interestatal o internacional —ya sea de su faz o por su efecto— es virtualmente inválida o inválida *per se*. Chemical Waste Management v. Hunt, 504 U.S. 334 (1992); Philadelphia v. New Jersey, 437 U.S. 617 (1978); Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573 (1986); Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). Véase además, Tribe, *op cit.*, pág. 1059.

[16] Este "test" también recoge requisitos del debido proceso de ley. Véase, Tribe, *op cit.*, a la pág. 1106.

D

Luego de haber expuesto el estado de derecho relativo al aspecto durmiente de la cláusula de comercio, procedemos a analizar en conjunto los señalamientos de error segundo y tercero. En esencia, los peticionarios alegan que el Artículo 2 de la Ley Núm. 69, ante, discrimina en su propósito y en su efecto contra el comercio interestatal y, por ende, viola la cláusula de comercio y la Sección 3 de la Ley de Relaciones Federales.

En primer lugar, debemos despachar, sin mayor análisis, la posible controversia de si la Ley Núm. 69, ante, aquí impugnada es discriminatoria de su faz, resaltando que en la petición jurada presentada ante el foro primario, los propios peticionarios reconocen que la mencionada Ley no lo es. Asimismo, destacamos que en el presente caso, no existe disputa en cuanto a que la Ley impugnada aplica por igual a empresas locales, estatales o internacionales, toda vez que las mencionadas empresas tendrán que pagar una contribución que dependerá del volumen de producción que tengan, independientemente de su lugar de origen.

A pesar de ello, los peticionarios alegan que erraron tanto el foro primario como el foro apelativo intermedio al no utilizar el historial legislativo de la Ley Núm. 69, ante, para determinar que la medida tenía un propósito discriminatorio o, en otras palabras, que sí era discriminatoria de su faz.

En cuanto a dicha postura, es menester señalar que en reiteradas ocasiones hemos resuelto que "si [una] ley carece de exposición de motivos o, cuando aun teniéndola, no contiene la intención legislativa, es útil consultar otros documentos tales como los informes de las comisiones que estudiaron el proyecto de ley y los debates celebrados cuando la medida fue discutida en el hemiciclo, según aparecen en el Diario de Sesiones." Vicenti Damiani v. Saldaña Acha, 157 D.P.R. 38 (2002); Chévere v. Levis Goldstein, 150 D.P.R. 525 (2000). En otras palabras, la norma en cuanto a cómo se debe analizar la intención legislativa de un estatuto es buscarla en la exposición de motivos y que solamente en casos en que no exista exposición de motivos o que la intención legislativa no esté allí expresada es que se recurre a otros documentos.

Y es que no puede ser de otra manera, toda vez que interpretar la intención legislativa de una ley a base de otros documentos diferentes a la exposición de motivos —-claro está cuando ésta contiene la susodicha intención—- sería afirmar sub-silentio que la Asamblea Legislativa "dice una cosa pero quiere otra". De igual forma, no es lo mismo interpretar un estatuto para poder aplicarlo que interpretarlo con miras a determinar la intención del legislador a la hora de aprobarlo. En cuanto a dicha disyuntiva, resultan ilustradoras las siguientes expresiones del Tribunal Supremo federal:

> "Inquiries into congressional motives or purposes
> are a hazardous matter. When the issue is simply

the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it." (Énfasis nuestro) United States v. O'Brien, 391 U.S. 367, 383-384 (1968).

Este Tribunal ha hecho expresiones similares en cuanto a la utilización de expresiones de legisladores durante el debate legislativo a la hora de interpretar una ley. A tales efectos hemos expresado que: "es regla generalmente aceptada que las expresiones de un legislador, en el hemiciclo del cuerpo legislativo a que pertenece, no son suficientemente representativas de la intención colectiva del cuerpo que aprueba el estatuto." Vázquez v. Secretario de Hacienda, 103 D.P.R. 388, 390 (1975). Además, es norma reiterada que las leyes "han de ser interpretadas a base de lo que la Asamblea Legislativa hizo y no a base de lo que ésta dejó de hacer, ni de la actuación personal de uno de sus miembros." Elicier v. Sucesión Cautiño, 70 D.P.R. 432, 437 (1949).

Expresado lo anterior, analizamos la exposición de motivos de la Ley Núm. 69, ante, para determinar si es necesario recurrir a otros documentos para establecer cuál

fue la intención de los legisladores a la hora de aprobarla. La mencionada exposición de motivos en su parte pertinente dispone que:

> "Las medidas impositivas que se establecen mediante esta medida no deben afectar otras áreas de la base económica del país. Por ello, en el caso de la cerveza, se utiliza el mecanismo avalado por el Tribunal Supremo de Puerto Rico en *U.S. Brewers Association v. Secretario de Hacienda,* 103 D.P.R. 456 (1980), para garantizar que las industrias de menor producción puedan continuar operaciones de forma inalterada. En esos casos, según aumente su capacidad productiva, y como resultado, su estabilidad económica, se aumenta paulatinamente su responsabilidad con el fisco. Ante eso, es política pública del Estado Libre Asociado fomentar que industrias pequeñas que producen cervezas no reciban el peso del nuevo aumento de arbitrio hasta que su producción anual y capacidad económica lo justifiquen…" (Énfasis nuestro).

De un análisis del texto antes citado, se desprende con meridiana claridad y libre de ambigüedades que la intención de la Asamblea Legislativa a la hora de aprobar dicha Ley fue la de aprobar un nuevo arbitrio mientras garantizaba, a su vez, que las cervecerías pequeñas pudieran continuar operaciones sin recibir el peso del mismo hasta que su producción anual lo justificara. Recordemos que "cuando la ley es clara y libre de toda ambigüedad, se debe observar su letra." Artículo 14 del Código Civil, 31 L.P.R.A. § 14; E.L.A. v. Rodríguez Santana, res. el 24 de febrero de 2005, 2005 TSPR 13.

Conforme lo expresado anteriormente, somos del criterio que actuaron correctamente los tribunales de Primera Instancia y el de Apelaciones al resolver que la intención

legislativa que llevó a la aprobación de la Ley Núm. 69 no es discriminatoria de su faz, ya que surge diáfanamente de su exposición de motivos. De igual forma, y contrario a lo sostenido por los peticionarios, entendemos que para llegar a dicha conclusión no había que auscultar las expresiones de varios legisladores durante el proceso de debate legislativo.

Por otro lado, los peticionarios sostienen que la ley impugnada tiene un efecto discriminatorio en el comercio interestatal. Para ello, se apoyan en Bacchus Imports v. Díaz, ante, caso en el que el Tribunal Supremo federal invalidó una ley del Estado de Hawái que establecía un impuesto a las bebidas alcohólicas con las únicas excepciones de dos bebidas que se producían únicamente en dicho estado.[17]

Al examinar el propósito de la mencionada legislación, el Tribunal Supremo federal expresó que "examination of the State's purpose in this case is sufficient to demonstrate the State's lack of entitlement to a more flexible approach permitting inquiry into the balance between local benefits and the burden on interstate commerce". *Ibid*, a la pág. 270. No obstante lo anterior, el máximo foro federal expresó que: "Likewise, the effect of the exemption is clearly discriminatory, in that it applies only to locally produced beverages, even though it does not apply to all such

---

[17] Dichas bebidas eran el Okolehao, bebida elaborada a base de la raíz de una planta oriunda de Hawái, y los vinos de frutas.

products. Consequently, as long as there is some competition between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect." *Ibid*, a la pág. 271.

Como se puede apreciar de lo anterior, el Tribunal Supremo federal declaró inconstitucional la ley impugnada debido a que era discriminatoria de su faz --en su propósito-- y por sus efectos. A raíz de esto último, es que los peticionarios esbozan su argumento en cuanto a que la Ley 69, ante, es discriminatoria por su efecto. No obstante, somos del criterio que lo resuelto en Bacchus, ante, en cuanto al efecto discriminatorio de la ley, no es aplicable al presente caso.

Primeramente las leyes involucradas en ambos casos son claramente diferentes. Mientras la de Bacchus, ante, intentaba proteger exclusivamente la industria Hawáiana de licores, eximiendo de la aplicación del impuesto a varias bebidas que únicamente se producían en Hawái, la del caso de autos pretende garantizar que las industrias de menor producción --independientemente de su lugar de procedencia-- puedan absorber la contribución impuesta sin cesar operaciones. Surge de la propia Ley que para cumplir dicho propósito la Asamblea Legislativa de Puerto Rico estableció un sistema de exenciones escalonadas el cual intenta permitir que la responsabilidad de las compañías ante el

fisco aumente paulatinamente mientras aumenta la estabilidad económica de éstas.[18]

Como vimos, en Bacchus, ante, el Tribunal Supremo federal le dio especial énfasis a que la única bebida beneficiada por la exención era Hawáiana, cosa que no ocurre en el presente caso. Del expediente del caso ante nuestra consideración se desprende que los propios peticionarios admiten que existen bebidas extranjeras como Mike's Hard Lemonade y Cruzan Island Cocktails que se benefician de la exención especial y otras como Samuel Adams y Bacardí Breezers que fueron elegibles o descontinuaron su producción, por lo cual la cervecería local no es la única beneficiada por las exenciones ofrecidas por dicho estatuto.

Además, es un hecho no disputado que las exenciones aprobadas aplican y pueden aplicar de igual manera a cervecerías locales, estatales o extranjeras permitiendo que el nivel contributivo varíe dependiendo de la producción anual de éstas. O sea, que una cervecería que hoy esté beneficiándose de alguna de las exenciones impuestas, al año siguiente puede beneficiarse de una menor o hasta de ninguna dependiendo de cómo varíe su producción. Asimismo, resulta poco arriesgado afirmar que cervecerías extranjeras pequeñas

---

[18] Debemos resaltar que la Asamblea Legislativa posee una amplia discreción en el campo contributivo y que "tradicionalmente la 'clasificación' ha sido un método para ajustar los programas contributivos a las necesidades y usos locales a fin de lograr una distribución equitativa en la carga contributiva". U.S. Brewers Assoc. v. Secretario de Hacienda, ante; Miranda v. Sec. de Hacienda, 77 D.P.R. 171, 178 (1954).

pudieran acogerse al mencionado beneficio si deciden vender sus productos en Puerto Rico.

En otras palabras, para resolver que el efecto del Artículo 2 de la Ley Núm. 69, ante, es discriminatorio contra el comercio interestatal se requiere una determinación de que dicha ley tiene el efecto de no permitir que entidades fuera de Puerto Rico se acojan a sus beneficios, lo que según hemos visto no es correcto.

Asimismo, aunque es cierto que la cláusula de comercio en su estado durmiente prohíbe que los estados aprueben leyes económicas que discriminen contra productos extranjeros por razón de su lugar de origen, no podemos afirmar que dicha cláusula prohíbe que un estado apruebe una ley que, en términos técnicos, aplique de forma diferente a diversos productos o productores. Claro, ello será así siempre y cuando dicha diferencia no tenga nada que ver con la procedencia de los productos sino con aspectos comunes o neutrales que puedan variar de compañía en compañía independientemente de su lugar de origen. Al respecto resultan pertinentes las siguientes expresiones del Tribunal Supremo federal: "[T]he Commerce Clause <u>is not violated</u> when the <u>differential treatment</u> of two categories of companies <u>results solely from differences between the nature of their businesses</u>, not from the location of their activities." <u>Kraft general Foods, Inc.</u> v. <u>Iowa Department of Revenue and Finance</u>, 505 U.S. 71, 78 (1992).

Por dichos fundamentos, somos del criterio que el Artículo 2 de la Ley Núm. 69, ante, no discrimina por su aplicación o efecto contra el comercio interestatal. Ahora bien, aquí no termina nuestro análisis. Como mencionamos anteriormente, las leyes contributivas estatales, además de que no sean discriminatorias, deben cumplir con otros criterios para sobrevivir un ataque al amparo de la cláusula de comercio. Estos criterios son: 1) que el impuesto aplique a alguna actividad que tenga un nexo sustancial con el estado, 2) que esté justamente distribuido, y 3) que se relaciona adecuadamente con servicios ofrecidos por el estado.

Los peticionarios, no han esbozado argumento alguno dirigido a demostrar que el Artículo 2 de la Ley Núm. 69, ante, no cumple con algunos de los criterios antes mencionados. No obstante ello, resulta claro que el impuesto que establece la Ley Núm. 69 --y por ende la exención impugnada-- aplica a una actividad con nexo sustancial con Puerto Rico y se relaciona con servicios ofrecidos por éste, o sea, la autorización para la venta de bebidas alcohólicas en nuestra jurisdicción. Además, está justamente distribuido toda vez que la exención es menor mientras más producción tenga la empresa.

Finalmente, debemos mencionar que cuando se impugna una ley estatal que impone un impuesto por alegadamente discriminar contra el comercio internacional también hay que analizar los siguientes criterios: 1) "whether the tax,

notwithstanding apportionment, creates a substantial risk of international multiple taxation"; y 2) "whether the tax prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 451 (1979).

En cuanto al primer criterio el Tribunal Supremo federal ha indicado que un impuesto estatal será validado a menos que el riesgo de doble tributación sea inevitable. Barclays Bank PLC v. Franchise Tax Board, 512 U.S. 298 (1994); Container Corp. of America v. Franchise Tax Board, 463 U.S. 159 (1983). Resulta obvio que el impuesto que da pie a la exención aquí impugnada no expone un riesgo para la doble tributación, ya que solamente recae sobre la bebida que se vende en Puerto Rico.

Sobre el segundo criterio, lo que se pretende es evitar que se desvirtúe el interés Congresional en establecer una uniformidad en cuanto a las relaciones comerciales con otros países. Dicho criterio presupone que el Congreso haya expresado de forma clara su intención de crear la mencionada uniformidad. Barclays Bank PLC v. Franchise Tax Board, ante. En el presente caso no existe intención Congresional de mantener la mencionada uniformidad y, además, existe un sinnúmero de estados con leyes diferentes que imponen distintos impuestos a las cervezas y demás bebidas.[19]

---

[19] Véase a modo de ejemplo: Wyo. Stat. § 12-3-101 (Wyoming); W. Va. Stat. § 11-16-13 (West Virginia); 72 P.S. § 9010 (Pennsylvania); N.M. Stat. Ann. § 7-17-2 (Nuevo Méjico);

Somos del criterio, repetimos, que el Artículo 2 de la Ley Núm. 69, ante, no viola la cláusula de comercio interestatal, toda vez que: 1) no tiene un propósito discriminatorio; 2) no tiene un efecto discriminatorio; 3) aplica a una actividad que tiene un nexo sustancial con Puerto Rico; 4) está justamente distribuido; 5) se relaciona adecuadamente con servicios ofrecidos por el estado; 6) no constituye un riesgo sustancial de múltiple tributación; y 7) no afecta algún posible interés del gobierno federal en mantener una uniformidad con el comercio internacional.[20] En conclusión, somos de la opinión que actuaron correctamente tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones al desestimar la petición jurada que motivó el caso de autos.

---

Wis. Stat. § 139.02(1) (Wisconsin); y Tex. Alco. Bev. Code § 203.01 (Texas).

[20] Los peticionarios también arguyen que el Artículo 2 de la Ley Núm. 69, ante, viola la Sección 3 de la Ley de Relaciones Federales, ante. Ciertamente, ante nuestra opinión respecto a la cláusula de comercio resulta innecesario atender dicho planteamiento, toda vez que el análisis requerido por la cláusula de comercio es, por lo menos, más estricto que el que requiere la Sección 3 de la Ley de Relaciones Federales, ante. Así pues, entendemos que una ley que supere el análisis requerido por la cláusula de comercio --como lo es el Artículo 2 de la Ley Núm. 69, ante-- obligatoriamente superará un ataque al amparo de la sección 3 de la Ley de Relaciones Federales.

Por todo lo anteriormente expuesto, es que estamos conforme con la Sentencia emitida por el Tribunal en el presente caso.


FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación Puertorriqueña de
Importadores de Cerveza, Inc.,
y Otros

     Recurridos

       vs.                    CC-2003-831     Certiorari

Estado Libre Asociado de
Puerto Rico; José A. Flores
Galarza, Etc.

     Peticionarios


Opinión de Conformidad emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.


San Juan, Puerto Rico, a 16 de mayo de 2007.


Estoy conforme con la sentencia emitida por el Tribunal en el caso de autos. Para mí es claro que el Art. 2 de la Ley Núm. 69 del 30 de mayo de 2002 **no tiene defecto constitucional alguno**, por lo que procede la desestimación de la acción incoada por los demandantes, como correctamente lo decidieron antes el foro de instancia y el foro apelativo.

Para resolver este caso sólo es menester aplicar a sus hechos lo resuelto antes por este Foro en <u>U.S. Brewers Assoc. v. Srio. de Hacienda</u>, 109 D.P.R. 456 (1980), **que presentaba una situación esencialmente idéntica a la del caso de autos**, tal como lo hicieron correctamente los foros *a quo*. <u>U.S. Brewers Assoc. v. Srio. de Hacienda</u>, *supra*, es un

claro precedente determinativo de la controversia en el caso de autos, que puede adjudicarse sencillamente con sólo aplicar aquí el precedente referido.

Lo anterior no obstante, deseo tratar en esta opinión el espinoso asunto de si aplican *ex proprio vigore* a Puerto Rico las limitaciones que proceden de la Cláusula de Comercio Interestatal de la Constitución federal. El asunto fue planteado en el caso de autos, y provocó la otra opinión de conformidad que se ha emitido aquí, la cual considero errada y propensa a causar confusión. Por ello, me parecer menester entrar a considerar a fondo la cuestión referida.

Se trata de un asunto que ha estado ante nuestra consideración varias veces antes, pero que este Tribunal ha tratado **con ambivalencia**, al menos en épocas recientes. En las primeras ocasiones que el asunto se planteó, este Tribunal resolvió muy deliberadamente que **el llamado aspecto "durmiente" de la cláusula de comercio de la Constitución federal no aplicaba a Puerto Rico**. Lo resolvimos así *antes* del establecimiento del Estado Libre Asociado, en la enjundiosa decisión de <u>Ballester Hnos. v. Tribunal de Contribuciones</u>, 66 D.P.R. 560 (1946); y luego del establecimiento del Estado Libre Asociado, lo volvimos a resolver en la muy ponderada y medular decisión de <u>R.C.A. v. Gobierno de la Capital</u>, 91 D.P.R. 416 (1964), al igual que en <u>South Puerto Rico Sugar Corp. v. Comisión de Servicio Público</u>, 93 D.P.R. 12 (1966). Sin embargo, a pesar de esos claros y substanciosos precedentes, más recientemente, en un

caso en que se volvió a plantear el asunto, este Foro titubeó y optó por no reiterar lo resuelto antes en las tres opiniones citadas, prefiriendo en vez limitarse a señalar que aun si la Cláusula de Comercio fuese aplicable, los hechos en cuestión no constituían una violación a dicha Cláusula. M & B. S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319, 336 (1987).

En mi criterio, el tema aludido merece el mayor estudio y reflexión por la sencilla razón de que la errada noción de que la Cláusula de Comercio Interestatal de la constitución federal aplica a Puerto Rico *ex proprio vigore* pone sobre las espaldas del gobierno del país una innecesaria carga jurídica que opera **como una limitación más a su capacidad de encarar con éxito los graves problemas económicos de Puerto Rico**. No queda, pues, otra alternativa que denunciar con vehemencia la supuesta aplicabilidad de la Cláusula referida, y explicar los fundamentos de nuestro parecer. Veamos.

II

¿Por qué prevalece aún entre algunos en Puerto Rico la errada noción de que nuestro país está sujeto a las limitaciones que proceden de la Cláusula sobre el Comercio Interestatal de la Constitución norteamericana? ¿Por qué no se acatan las tres opiniones de este Tribunal, citadas dos párrafos atrás, que resuelven definitivamente la inaplicabilidad a Puerto Rico de la normativa federal en

cuestión? ¿Cuál es la razón detrás del empeño por introducir en nuestra jurisprudencia el erróneo criterio jurídico de que a Puerto Rico le obliga el aspecto durmiente de la cláusula de comercio interestatal de la Constitución americana?

La respuesta a las interrogantes anteriores la encontramos en un supuesto "caso clave" del Tribunal del Primer Circuito de Apelaciones federal en que se basa la otra opinión de conformidad emitida en este caso. Dicha opinión evidentemente no es nada más que una secuela de la sentencia federal aludida, que se ha adoptado aquí de modo mimético. Por ello, hay que ir a la fuente originaria del asunto, para examinar críticamente lo decretado allí.


III

El Primer Circuito federal había resuelto ya desde 1932 que la cláusula de comercio interestatal de la Constitución de Estado Unidos no aplicaba a Puerto Rico. Lo hizo así en Lugo v. Suazo, 59 F 2d 386 (1932); y lo reiteró posteriormente en Buscaglia v. Ballester, 162 F 2d 805, cert. denied, 332 US 816 (1947). Así que por décadas, tanto el Tribunal Supremo de Puerto Rico, como el Tribunal de Apelaciones del Primer Circuito federal sostuvieron reiteradamente ambos que no aplicaba a Puerto Rico la cláusula referida. Los fundamentos para lo resuelto por uno y otro foro fueron esencialmente los mismos, y pueden resumirse como se explica a continuación.

Desde sus inicios, la relación entre Estado Unidos y Puerto Rico ha estado sujeta al principio fundamental de que la **Constitución federal no aplica enteramente a Puerto Rico, por no ser ni haber sido nunca la isla un territorio incorporado a la Unión Americana ni formar parte integral de los Estados Unidos.** Reiteradamente ha resuelto el Tribunal Supremo federal que sólo aplican a plenitud a Puerto Rico las garantías de los principales derechos fundamentales de las personas provistas por la Constitución de Estados Unidos, que por su propia naturaleza siempre limitan el ejercicio del poder ejecutivo y legislativo federal. Una de las cláusulas de dicha Constitución que nunca ningún tribunal federal había aplicado a Puerto Rico era precisamente la relativa al comercio, que dispone que el Congreso tiene la facultad de regular "*... commerce ... among the several States ...*". Puerto Rico, claro está, no es un "estado", por lo que reiteradamente se había resuelto que la isla no estaba cobijada dentro del poder congresional de regular el comercio entre los estados. **Lo anterior no significaba que el comercio entre Puerto Rico y los Estados Unidos no estuviese sujeto al poder del Congreso**. Sólo que ello se regulaba únicamente mediante la cláusula que le otorga al Congreso el poder de reglamentar los territorios de Estados Unidos, la llamada Cláusula Territorial. Es por lo anterior que la Cláusula de Comercio, en su aspecto "durmiente" siempre había sido concebida sólo como una

**limitación a los poderes de los Estados**. Nunca como una limitación a los poderes gubernamentales de los territorios.

Sobre lo señalado en el párrafo anterior, debe tenerse en cuenta, además, la conocida renuencia del Tribunal Supremo de Estados Unidos a atribuirle vigencia respecto a Puerto Rico a cualquier disposición de la Constitución federal que se refiera literalmente a los "estados" de la Unión (*States*). Así, pues, en Puerto Rico v. Branstad, 107 S. Ct. 2802 (1987), el Tribunal Supremo federal aplicó a Puerto Rico **el estatuto federal de extradición**, que abarca expresamente a los territorios de Estados Unidos, para no tener que resolver si la Cláusula de Extradición de la Constitución federal, Art. IV, Sec. 2, aplicaba a Puerto Rico.[21] El más alto foro federal señaló lo siguiente:

> "It is true that the words of the [Extradition] clause apply only to "States" and we have never held that the Commonwealth of Puerto Rico is entitled to all the benefits conferred upon the States under the Constitution. We need not decide today what applicability the Extradition Clause may have to the Commonwealth of Puerto Rico, however, for the Extradition Act clearly applies. The Act requires rendition of fugitives at the request of a demanding "Territory", as well as a State."

La renuencia aludida, ilustrada por el caso de Puerto Rico v. Branstad, *supra*, ha sido manifestada en varias otras decisiones importantes del Tribunal Supremo de Estados Unidos concernientes a Puerto Rico. Así pues, en Calero

---

[21] La Cláusula de Extradición, en lo pertinente, lee así: "Toda persona acusada de ... delito ... que huye del estado en donde se le acusa y fuera hallada en otro estado, será ... devuelta al estado que tuviera jurisdicción para conocer del delito."

<u>Toledo v. Pearson Yatch Leasing Co.</u>, 416 U.S. 663 (1974), dicho Foro determinó que las garantías del debido proceso de ley y de la igual protección de las leyes aplicaban a Puerto Rico, pero rehusó resolver que la Enmienda Catorce de la Constitución federal, que hace extensiva tales garantías expresamente a los estados de la unión, fuese aplicable a Puerto Rico, por no ser éste un estado. El Tribunal optó en vez por resolver que las normas constitucionales referidas aplicaban a Puerto Rico al amparo de la Quinta Enmienda o de la Catorce, sin precisar cuál ("*Either-or*"). Así mismo sucedió en <u>Examining Board v. Flores Otero</u>, 426 US 572 (1976). En este caso, uno de los Jueces del Tribunal, el Juez Rehnquist, quien luego fue Juez Presidente, expresó lo siguiente en su propia opinión:

> "The Fourteenth Amendment is by its terms applicable to States: Puerto Rico is not a State... I would be inclined to reject the claim that the Fourteenth Amendment is applicable to Puerto Rico until a case sufficiently strong to overcome this "plain meaning" obstacle, found in the language of the Amendment itself, is made out."

A la luz de lo anterior, que alude a casos resueltos **<u>después</u>** de la creación del Estado Libre Asociado, parece evidente que el propio Tribunal Supremo de los Estados Unidos no estaría dispuesto a sostener que la disposición de la Constitución federal que regula el comercio "*... among ... the several States*" de modo alguno se refiera a Puerto Rico, que claramente no es un estado.

Cuando el Tribunal federal del Primer Circuito decidió revocarse a sí mismo sobre este asunto en 1992, lo hizo mediante un análisis muy limitado y superficial, que no replicaba de modo alguno los fundamentos de los precedentes contrarios tanto de ese mismo foro como los de este Tribunal. Su "análisis" se limitó en esencia a apoyarse en dos señalamientos. Primero, que la creación del Estado Libre Asociado procuró concederle a Puerto Rico el grado de autonomía e independencia que normalmente se asocia con los estados de la Unión. Por ende, razonó dicho Foro, le aplicaban a Puerto Rico las limitaciones que le aplican a los estados de la Unión.

Nótese que este primer argumento tiene la anomalía, para no decir el desatino, **de derivar una limitación de poder invocando una concesión de autonomía de poder**. El argumento falaz es que como a Puerto Rico se le concedió al crearse el Estado Libre Asociado un mayor grado de autonomía que el que tenía antes, comparable a lo de los estados de la Unión, se le impuso a la vez una limitación de poder que no tenía antes. Es decir, a la reiterada afirmación formulada por el propio Tribunal Supremo federal, reconociendo la **mayor autonomía** que significaba para Puerto Rico la creación del Estado Libre Asociado (<u>Puerto Rico v. Branstad</u>, *supra*; <u>Examining Board of Engineers v. Flores de Otero</u>, *supra*) el Tribunal del Primer Circuito le añadió como cosa suya **una limitación**, que no surge de ningún modo de lo expresado por el más alto foro federal, y que no es de manera alguna

consistente con la evidente intención del Tribunal Supremo de Estados Unidos de **resaltar** la importancia de lo creado mediante la Ley Pública 600. El Tribunal Supremo federal, que ha reclamado sólo para sí la autoridad de determinar qué cláusulas de la Constitución federal le aplican a Puerto Rico, en ausencia de alguna disposición congresional al respecto [Torres v. Puerto Rico, 442 US 465 (1979); Examining Board v. Flores de Otero, *supra*] nunca ha determinado que la cláusula de comercio aplica a Puerto Rico, aun luego de habérsele planteado el asunto. A pesar de ello, sin embargo, el foro apelativo intermedio federal se ha creído facultado a inmiscuirse en el tema, para decretar lo que el más alto foro judicial no ha estimado procedente resolver.

Más aun, la noción del Tribunal Supremo federal de que la creación del Estado Libre Asociado aparejó asemejar a Puerto Rico a los estados de la Unión en autonomía e independencia escasamente puede manejarse con la laxitud que la utiliza el tribunal del Primer Circuito en la jurisprudencia que aquí nos concierne. Ello, no sólo por el hecho de que los informes congresionales con respecto a la Ley Pública 600 hacen hincapié en que con la creación del Estado Libre Asociado no se pretendió alterar **fundamentalmente** la relación entre Estados Unidos y Puerto Rico [véase, US v. López Andino, 831 F 2d 1164, (1987), op. concurrente del Juez Torruellas] sino además por el otro hecho innegable de que la propia autonomía de los estados de

la Unión se afinca en gran medida en sus poderes políticos de representación congresional plena y de voto presidencial, ninguna de las cuales tiene Puerto Rico; y en la garantía que provee la Décima Enmienda de la Constitución americana, que de ningún modo abarca a Puerto Rico. Por ello, es menester ser cauteloso y no pretender derivar nuevas y extrañas conclusiones, partiendo de la premisa de que Puerto Rico posee "la autonomía y la independencia" de un estado de la Unión.

Finalmente, al ponderar el asunto que aquí nos concierne, sobre el significado que puede derivarse de la creación del Estado Libre Asociado de Puerto Rico, es menester considerar lo que ha dicho también el propio Tribunal Supremo federal, a los efectos de que

> "...Puerto Rico ... is an autonomous political entity, sovereign over matters not ruled by the Constitution ..."

Posadas v. Tourism Co., 478 US 328 (1986); Rodríguez v. Popular Democratic Party, 457 US 1, 8 (1982). Parecería que la pretensión de imponer una limitación sobre los poderes legislativos de Puerto Rico al amparo del aspecto "durmiente" de la Cláusula de Comercio es claramente improcedente e inconsistente con esta otra expresión del Tribunal Supremo americano. Cuando menos, la postura de la otra opinión de conformidad en este caso haciéndole eco ahora al decreto en cuestión del Primer Circuito no es armonizable de modo alguno con las reiteradas expresiones del Tribunal Supremo de Puerto Rico sobre la amplia

autoridad jurídica del Estado Libre Asociado. Véase, Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141 (1997); Pueblo v. Castro García, 120 D.P.R. 740 (1988); R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416 (1964), y Pueblo v. Figueroa, 77 D.P.R. 188 (1954).

IV

El otro señalamiento en que se apoyó el Primer Circuito en su referida decisión de 1992 es la noción de que Puerto Rico comparte la plena integración económica con Estados Unidos como cualquier estado de la Unión. La supuesta "lógica" de este otro señalamiento es que estando Puerto Rico en una situación comparable a la de un estado de la Unión en lo que se refiere a la "integración económica de los Estados Unidos", debe aplicarle a Puerto Rico la misma limitación que le aplica a los estados de la Unión en cuanto al comercio interestatal. El problema con este otro argumento es que es tan falaz como el primero, que se discutió en los párrafos anteriores.

La noción de que Puerto Rico comparte con los estados de la Unión una comparable integración económica a los Estados Unidos choca de frente con varias realidades que son conocidas por los que tratan bien con estos asuntos. Puerto Rico, para comenzar, no está sujeto a las leyes de rentas internas federales como lo están los estados de la Unión. Por un lado, los residentes de Puerto Rico no pagan impuestos y contribuciones federales como lo hacen los

residentes de los estados de la Unión. Por otro lado, los fondos que se obtienen de los arbitrios federales que se cobran en Estados Unidos con respecto a artículos y materiales manufacturados en Puerto Rico -los arbitrios sobre el ron- se destinan al erario nuestro, contrario a lo que sucede con todos los otros arbitrios federales que se cobran en los estados de la Unión sobre artículos y materiales manufacturados en éstos, que ingresan como es natural al erario federal. La situación contributiva especial de Puerto Rico antes mencionada, que representa por sí sola miles de millones de dólares anualmente que benefician a la economía de Puerto Rico de un modo no asequible a ningún estado de la Unión, es claramente contraria a la falaz noción de igual "integración económica" mencionada antes.

Otra diferencia entre los estados de la Unión y Puerto Rico relativa a lo económico es que la Ley sobre Comercio Interestatal federal expresamente no aplica a la isla aunque regula intensamente aspectos de la transportación de los estados de la Unión. Este dato presenta un problema serio para los que afirman que la Cláusula de Comercio interestatal de la Constitución federal aplica a Puerto Rico. Evidentemente resulta cuando menos inconsistente que se considere que la referida disposición constitucional ha sido extendido a la isla tácitamente por el Congreso, pero que uno de los estatutos principales legislado por el mismo Congreso al amparo de dicha disposición no se extiende a

Puerto Rico. En la otra opinión de conformidad emitida en este caso ni se intenta explicar este enredo. De cualquier modo, el estatuto en cuestión aplica a los estados de la Unión, pero no a Puerto Rico, lo que forma parte de las amplias diferencias entre los estados y Puerto Rico en lo referente a asuntos económicos.

También debe mencionarse otra diferencia muy particular, que es la relativa a las tarifas sobre el café. En virtud de la Sección 10 del Artículo I de la Constitución federal, los estados de la Unión de ordinario están impedidos de imponer contribuciones sobre las importaciones. No obstante, Puerto Rico ha sido expresamente autorizado a imponer tarifas sobre el café importado aunque los estados de la Unión no pueden hacerlo. Véase, 19 USC sec. 1319; Miranda v. People of P.R., 101 F 2d 26 (1938). De esta forma, Puerto Rico puede proteger su propia industria del café, de la competencia que representa la importación del café más barato del extranjero.

Además de lo relativo a rentas internas, y a las tarifas sobre el café, existen varios otros esquemas jurídicos y reglamentarios federales, también **de índole económica**, cuya aplicación a Puerto Rico es muy distinta a la de los estados de la Unión. Sería prolijo enumerarlas todas aquí. Basta con señalar que se trata de asuntos de gran importancia económica con respecto a los cuales la situación de Puerto Rico es notablemente distinta a la de cualquier estado de la Unión. Así pues, programas de ayuda

económica, incluyendo los de asistencia para alimentos, el Seguro Social, el salario mínimo federal, algunas leyes bancarias y leyes laborales federales, las leyes sobre tarifas aduaneras, las relativas a almirantazgo y transportación marítima, y varias sobre otros asuntos aplican o han aplicado históricamente de manera diferente en Puerto Rico en comparación con su vigencia en los estados de la Unión. Véase, A.H. Leibowitz, *The Appicability of Federal Law To The Commonwealth of Puerto Rico*, 37 Rev. Jur. UPR 615 (1968).

Con relación a lo anterior, también es menester tomar en cuenta la reiterada postura del Tribunal Supremo federal validando el trato distinto del Congreso con respecto a Puerto Rico, en comparación con el trato del Congreso a los estados de la Unión en todas estas cuestiones económicas. El más alto foro federal ha resuelto expresamente **que el Congreso no tiene que darle a Puerto Rico el mismo trato económico que le da a los estados**, legitimando así las importantes diferencias que existen o han existido entre Puerto Rico y éstos. De este modo, el propio Tribunal Supremo federal ha rechazado la noción de que la isla y los estados de la Unión comparten una misma integración económica con la nación americana. Algunas de tales decisiones, para citar sólo las más recientes, son Harris v. Rosario, 446 U.S. 651 (1980), en la cual el Tribunal Supremo federal determinó que el Congreso no estaba obligado a tratar a Puerto Rico igual que un estado en el programa

de "*Aid to Families with Dependent Children*"; y Califano v. Torres, 435 U.S. 1 (1978), en el cual el Tribunal Supremo federal determinó lo mismo con respecto al programa de *Supplemental Security Income* (SSI).

Debe señalarse que el Tribunal Supremo federal ha sostenido la validez del trato diferente a Puerto Rico no sólo cuando el Congreso le ha dado *menos* a la isla que lo que ha dispuesto en beneficio de los residentes de los estados de la Unión, como en los dos casos citados en el párrafo anterior, sino también cuando el trato diferente ha consistido en darle a Puerto Rico *más* que lo que pueden hacer los estados de la Unión, como sucedió en West India Oil Co. v. Domenech, 311 US 20 (1940), relativo a los poderes de imponer arbitrios sobre importaciones, en el cual el Tribunal Supremo federal validó un poder otorgado por el Congreso a Puerto Rico que los estados de la Unión no poseían.

Es por todo lo anterior que no puede afirmarse verazmente que Puerto Rico es comparable a cualquier estado de la Unión en lo que se refiere a la integración económica nacional. **Puerto Rico, como los territorios no incorporados, siempre ha estado sujeto a importantes normas diferentes** a las que aplican a los estados de la Unión. Con tal trato diferente se ha procurado proveer la flexibilidad económica necesaria para que tanto el Congreso como Puerto Rico mismo puedan encarar exitosamente las significativas diferencias materiales que han existido y todavía existen entre la isla

y las jurisdicciones que forman parte integral de los Estados Unidos. Parece necesario mencionar la conocida realidad de que Puerto Rico, con todo lo que ha progresado económicamente desde los años terribles de 1898 a 1940, sigue estando separado por una abismal diferencia entre su frágil situación económica y la muy superior condición del estado más pobre de la nación americana. No tiene sentido alguno, pues, que se pretenda imponer una limitación artificial a las facultades de Puerto Rico para encarar sus propios problemas económicos, sólo por puro capricho judicial. Ni el Primer Circuito ni la otra opinión de conformidad en el caso de autos han identificado **qué propósitos de orden público persiguen lograr con su ofuscado decreto**. ¿Qué justificación existe para su dictamen? Más allá de su errado conceptualismo, ¿a qué responde la desatención a los tres precedentes de este mismo Foro? ¿A quién le causa daño que Puerto Rico pueda tener una facultad que los estados de la Unión no tienen?

V

Las interrogantes plantadas en el párrafo anterior conducen a un último señalamiento crítico. La cuestión de si la cláusula sobre comercio interestatal de la Constitución federal debe aplicarse o no a Puerto Rico, como la cuestión más general de qué disposiciones constitucionales federales deben extenderse a la isla, más allá de las relativas a los derechos fundamentales de las personas, **es en última**

**instancia una prerrogativa congresional**. Véase, <u>Torres v.</u> <u>Puerto Rico</u>, *supra*, págs. 469-470. Se trata de un asunto eminentemente político, que está comprendido, además, dentro de los amplios poderes que el propio Tribunal Supremo le ha reconocido al Congreso aun recientemente. <u>Harris v. Rosario</u>, *supra*, págs. 653-656. Es por ello que las decisiones del Primer Circuito sometiendo a Puerto Rico *ex proprio vigore* a las limitaciones de la cláusula de comercio en su fase "durmiente" es un acto *ultra vires* de ese Tribunal, una intervención claramente indebida de ese foro en un asunto que rebasa su autoridad. No hay nada en el récord legislativo que permita siquiera suponer que el Congreso ha tenido la intención de extender la cláusula referida a Puerto Rico. Por ende, no puede considerarse de modo alguno que las decisiones del Tribunal del Primer Circuito son sólo declarativas de la intención congresional. Constituyen, por ende, un acto de inmiscuirse indebidamente en un asunto que es una clara prerrogativa sólo del Congreso.

Es, en fin de cuentas, por lo anterior sobre todo que considero insostenible la otra opinión de conformidad en el caso de autos de servirle de eco al foro apelativo federal, copiando aquí sus muy desacertadas y erróneas decisiones sobre el asunto en cuestión.


                                    JAIME B. FUSTER BERLINGERI
                                         JUEZ ASOCIADO